# WHEELING.

## STATE v. GOULD.

Submitted June 19, 1885.—Decided July 3, 1885.

1. The first part of sec. 1, ch. 74 of Acts of 1875, which provides, "that if any person shall over-drive, torture, torment, deprive of necessary sustenance, or unnecessarily, or cruelly beat, or needlessly mutilate, or kill any domestic animal, * * * every such offender shall for every such offence be deemed guilty of a misdemeanor," creates seven separate and distinct offences of a similar character.   (p. 263.)

2. No two of these several and distinct offences can be united in one count of an indictment without rendering it fatally defective.   (p. 263.)

3. But the adding in any one count for over-driving, over-loading or depriving of necessary sustenance or unnecessarily or cruelly beating or needlessly mutilating or killing, the words and torture and torment or either of them, would not cause such count to be fatally defective as including a charge of more than one offence in a single count, the added words torture and torment would be mere surplusage.   (p. 263.)

4. It is sufficient in describing in an indictment any five of these offences to use the words of the statute "over-drive, over-load, deprive of necessary sustenance, unnecessarily and cruelly beat,

or needlessly mutilate and kill," as the case may be, without adding the circumstances or manner, in which the act was done. (p. 262.)

5. But this would not be sufficient in describing the other two offences, torturing or tormenting, but the circumstances and the manner of the torturing or tormenting, as the case may be, must be stated, as for instance, "killed a domestic animal known as a mule by breaking its hind leg by shooting it with a ball fired from a pistol held in the hand of the accused." (p. 263 )

6. Neither the ownership nor value of the domestic animal need be stated in an indictment under this statute. (p. 264.)

7. An indictment under this statute in the following form is sufficient: "The grand jurors of the State of West Virginia in and for the body of the county of Wood, and now attending said court upon their oaths present, that Stephen Gould on October 13, A. D. 1881, in the said county, did unlawfully and wilfully and cruelly beat, shoot, torture, and otherwise ill-treat a certain beast called a mule, the owner or owners of which said mule is to the grand jurors unknown, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State." In such an indictment the words, "shoot, torture, and otherwise ill-treat" and the words "the owner or owners of which said mule is to the grand jurors unknown," are mere surplusage. (p. 265.)

8. In such an indictment it was unnecessary to allege, that the mule was a domestic animal, as the court will take judicial notice, that all mules in this State are domestic animals. (p. 264.)

9. The court in rendering a judgment upon a verdict of guilty under this statute, or in rendering judgment against a defendant in any case upon the conviction of him of any misdemeanor, has no right to add to its judgment as a part thereof an order requiring the defendant to give a bond with approved security to keep the peace or be of good behaviour and in default thereof to be imprisoned, till such bond is given. If this be done, the case on writ of error will be reversed, and the proper judgment will be entered by the appellate court without remanding it to the court below. (p. 266.)

GREEN, JUDGE, furnishes the following statement of the case :

The grand jury of Wood county on November 14, 1881, found the following indictment :

"The grand jurors of the State of West Virginia in and for the body of the county of Wood, and now attending the said court, upon their oaths present, that Stephen Gould, on

October 13, A. D. 1881, in the said county, did unlawfully and wilfully and cruelly beat, shoot, torture, and otherwise ill-treat a certain beast called a mule, the owner or owners of which said mule is to the grand jurors unknown, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."

On January 11, 1882, the defendant, Stephen Gould, moved the circuit court of Wood county to quash this indictment for errors appearing on its face and also pleaded not guilty, on which issue was joined by the State. At the April term, 1882, of said court the defendant asked leave to withdraw his plea of not guilty and to demurr to the indictment, which the court refused to allow him to do. Thereupon a jury was sworn to try the issue, who on April 12, 1882, found the defendant guilty and assessed his fine at $50.00. On the next day the defendant moved to arrest this judgment, because the indictment was not sufficient in law. He also moved the court to set aside the verdict and grant him a new trial, because the verdict was contrary to the evidence. Which motion the court overruled and rendered judgment against the defendant for $50.00, the fine assessed by the jury, and for costs; and it further ordered that the defendant enter into bond in the penalty of $500.00 with security in the like sum to be approved by the court conditioned, that the said defendant shall keep the peace and be of good behavior for the term of three years from that date, and that he be taken and kept in custody of the sheriff of said county, until such bond be given. The execution of this judgment was suspended till the first day of the next term of said court, to which time the recognizance of said defendant was enlarged.

A bill of exceptions was taken by the defendant to the judgment of the court in overruling said motions in arrest of judgment and for a new trial and the entering up of said judgment against the defendant, which bill of exceptions certifies all the evidence given at the trial. This evidence proved the following facts: In October, 1881 a mule, whose property not proven, ran down the road in front of the barn of the defendant's father in said county. The defendant called to a colored woman in the road to stop the mule, which she did, and the mule then ran into the barn-yard and then into

the barn, and the defendant with a clapboard in his hand followed the mule into the barn, and he was heard across the road striking the mule. The mule then ran out of the barn; the defendant came out of the barn and fired with a revolver at the the mule but missed it; he then fired his revolver a second time at the mule, and the ball struck it in the hind leg and broke it. The defendant attempted to have the leg set but it could not be done and the mule was killed. The defendant, when he shot the mule, was behind it and about six yards distant. The defendant obtained a writ of error to the judgment of the court.

*W. L. Cole* for plaintiff in error.

*Alfred Caldwell*, Attorney General, for State.

GREEN, JUDGE:

The first question presented by this record is: Was the indictment sufficient? The indictment is for a violation of sec. 1 of ch. 74 of Acts of 1875, passed December 22, 1875. The section is as follows:

"That if any person shall overdrive, overload, torture, torment, deprive of necessary sustenance, or unnecessarily or cruelly beat, or needlessly mutilate or kill, or cause or procure to be overdrawn, overloaded, tortured, tormented, or deprived of necessary sustenance, or be unmercifully or cruelly beaten, or needlessly mutilated or killed, as aforesaid, any domestic animal, every such offender shall for every such offence be deemed guilty of a misdemeanor."

The sixth section of said act fixes as a punishment for the commission of this misdemeanor "a fine of not less than $50.00 or imprisonment in the county-jail for not more than ten days or both, at the discretion of the court together with the costs of prosecution." And there is added to this section the following clause: "And should such animal be the property of another the offender shall be liable to the owner thereof in damages in addition to the penalties herein prescribed." This clause, which was obviously an unnecessary addition, serves at least the purpose of showing beyond all dispute, that it is entirely immaterial to constitute this offence, that the accused should be the owner of the domes-

tic·animal cruelly treated.   The ownership of the animal is totally immaterial.   It was decided in *Gise* v. *State*, 37 Ark. 456, when the statute made it a misdemeanor to needlessly mutilate or kill, &c., any living. creature, that no allegation of value or ownership were essential.   This is clearly so under·our statute. . The Attorney General in his argument says, that it has been decided over and over again, that there is no necessity under statutes similar to ours to make any allegations in the indictment whatever in relation to ownership of the animal, to sustain which position he refers to *State* v. *Brocker*, 32 Tex. 611; *Damell* v. *State*, 6 Tex. Ct. App. 482; *Collier* v. *State*, *Id.* 12; *Turner* v. *State*, *Id.* 586; *Commonwealth* v. *McClellan*, 101 Mass. 34, and *Commonwealth* v. *Whitman*, 118 Mass. 458.   We have not here the ·Texas reports; but the two Massachusetts cases, which I have examined support the position of the Attorney General.   In the first it was held, that an indictment was good, which simply alleged, that the defendant "did cruelly beat a certain horse against the peace of the commonwealth and contrary to the form of the statute;" and in *Caldwell* v. *State*, 49 Ala. the indictment was held good, which alleged that the defendant "unlawfully and maliciously disabled and injured a cow the property of John Harrison."   And in· *Minnesota* v. *Comfort*, 22 Minn. an indictment was held good, which alleged that the defendant with another did cruelly, wilfully and with force and arms overdrive two horses, by reason of which said overdriving the said two horses were tortured and tormented. In delivering the opinion in this last case, Gilfillan, C. J., says: . "It is objected that the indictment should go beyond the words of the statute and more particularly describe what constituted the overdriving.   But a charge in the indictment may be in the words of the statute without a particular statement of facts and circumstances, when by using these the act, in which the offence consists, is fully, directly and expressly alleged without any uncertainty or ambiguity. (*Commonwealth* v. *Welsh*, 7 Gray 324.)   Such is the case in this indictment."

. From these decisions and from the rules of pleading generally I conclude, that under our statute, which ·makes several distinct offences of like general character misdemeanors,

it the offence charged be overdriving or overloading or depriving of necessary sustenance or needlessly mutilating or needlessly killing, it would be sufficient in an indictment to use the words of the statute, without a particular statement of facts and circumstances, as the act, in which the offence consists, is fully, directly and expressly alleged without uncertainty or ambiguity in all these cases. But if the offence, of which the party is accused, be torturing or tormenting, the indictment would be insufficient, if it simply used the words of the statute. It should more particularly describe the acts, which constitute the torturing, or which constitute the tormenting, as the case may be. Thus in *Commonwealth* v. *Whitman*, 118 Mass. the indictment alleged, that the defendant "did torture and mutilate said cow *by then and there* beating, bruising, cutting and wounding said cow." But though our statute, ch. 74, sec. 1 of Acts of 1875, makes several distinct acts misdemeanors, and several of them could not properly be inserted in one count in an indictment, such for instance as overdriving, overloading, depriving of necessary sustenance and beating; but these, if all committed, being in their nature distinct and separate acts and constituting distinct and separate offences should be alleged in seperate counts in an indictment and not in one count. Torturing and tormenting named in said act are not in their nature distinct acts from the overdriving, overloading and others; but this torturing and tormenting may consist of the same act as one of the others, as for instance, of beating, depriving of necessary sustenance and others, so that a charge of beating, torturing and tormenting, or a charge of depriving of necessary sustenance, torturing and tormenting would be a charge of but one offence and might properly be inserted in one count in an indictment. This was held in *Commonwealth* v. *Lumpkin*, 7 Allen (89 Mass.) 579.

Tested by these principles is the indictment good in this case? In the first place there is but one count in the indictment. Is it fatally defective as charging more than one distinct offence? The charge is of beating, shooting, torturing and otherwise ill-treating. The shooting and otherwise ill-treating alleged in this indictment must be regarded as simply surplusage. If it was intended to charge the defendant with

the shooting, it should have been done in a separate count, charging him with the torturing *by* shooting. He could not properly be charged with shooting, as it is not mentioned in the statute as one of the acts, which is declared a misdemeanor. If we leave out of this indictment these surplus words, it becomes simply a charge of beating and torturing, which for the reasons we have stated is a charge of but one offence. If in one count there had been a charge of beating and torturing by depriving of necessary sustenance, this would be a charge in one count of two separate offences, and it would have rendered the indictment fatally defective. But the count being for beating and torturing charges but one offence. (*Comm.* v. *Lumkins,* 89 Mass. (7 Allen) 579.) In truth thus connected the word to turing becomes simply surplusage. Though in a separate count stating the manner, in which the torture was inflicted, torturing would be an indictable offence.

But it is claimed, that this indictment is fatally defective in this, that the statute makes cruelly beating any *domestic animal* a misdemeanor, which offence is not charged, but the offence charged is "cruelly beating a certain beast called a mule;" and there is no allegation in the indictment that a mule is a *domestic animal,* as, it is claimed, there should have been, in order to make this indictment good. But there is nothing in this objection, as the Court will take judicial notice of the fact, that a mule is in this state a domestic animal. By the general rule with reference to what facts a court will take judicial notice of we would be bound to take notice judicially that in this State a mule is a domestic animal, and that there are no *wild* mules in the State. Thus it was expressly held in *Swartzbaugh* v. *The People,* 85 Ill. 457, that the Court will take judicial notice that in that State horses were domestic animals, and therefore in that case it was held that "an indictment for malicious mischief in wounding horses, is not bad because it fails to aver that the horses were domestic animals."

There is no objection to this indictment, as we have seen, because there is no allegation in it of the value of the mule, or who was the owner of it. No other objections to this indictment have been suggested; and we see none.

It was therefore a good indictment and the court did not err in refusing to quash it; nor did it err to the prejudice of the defendant in not permitting him to demur to this indictment; nor did it err in refusing to arrest judgment because of the insufficiency of this indictment.

The next enquiry is: Did the court err in refusing to grant a new trial, because the verdict of the jury was contrary to the evidence? As we have seen, every thing in this indictment with reference to the shooting, torturing, and otherwise ill-treating the mule must be regarded as surplusage and treated just as though nothing had been said in reference to shooting, torturing and ill-treating the mule. If the State had desired to prove these things, it should in a separate count have alleged, that the defendant tortured the mule by shooting it in the hind leg. The State not having done so, we must exclude from our consideration all that is proven with reference to the defendant's shooting this mule. When this has been done, all the evidence left pertinent to the issue is, to use the language of the bill of exceptions, "John Bartlett proved that in October last, while he was at work at the pottery just across the road from the barn-yard of defendant's father in this county, he saw the defendant and heard him calling to some one to stop a mule that was running down the road; that a colored woman turned the mule back, and it went into said barn-yard and into the barn; that the defendant with a clapboard in his hand followed the mule into the barn, and that he witness heard the defendant striking the mule in the barn but could not see him." The jury had a right to infer from this evidence, that the defendant cruelly beat this mule. He struck him blows with a clapboard, which the witness heard across the road; and though we might not infer from this evidence, that the defendant cruelly beat this mule, yet it is a mere inference of fact, and the jury having drawn it, and there being evidence from which they might not unreasonably draw such an inference, according to well established rules the court ought not to set aside their verdict and grant a new trial, because they did draw this inference. Judging from their verdict the inference would be that they regarded the evidence in relation to the shooting of the mule as irrelevant to the issue they were trying; for they

assessed the minimum fine against the defendant. If they had given consideration to the evidence with reference to the shooting of the mule, it would seem, as if they would have regarded the case as an aggravated offence and would have assessed more than the minimum fine, in which case the court might have inflicted in addition to the fine imprisonment, which it had the discretion to do.

It only remains to consider whether the court erred in adding to its judgment the order, "that said defendant do enter into bond in the penalty of $500.00 with security in the like sum of $500.00 to be approved by the court, conditioned that the said defendant shall keep the peace and be of good behavior for the term of three years from this date, and that he be taken and kept in custody by the sheriff of this county till said bond be given." In England it would seem, that such addition to a judgment for a common law misdemeanor may be made. Thus in *Dunn* v. *The Queen*, 61 Eng. C. L. R. (12 Ad. & Ell.) 1,031, decided in 1846 on an indictment for perjury a similar addition to the one in the case before us was added to the judgment. (See page 1,033.) Upon the review of this judgment by the appellate court the court by Park B. say, p. 104 : "All objections taken in this case to the judgment of the court of Queen's Bench were disposed of at the time of argument, except as to one point, on which the court entertained some little doubt ; whether upon a conviction for perjury, the court of Queen's Bench could add to the sentence of imprisonment, by ordering the defendant to find security for his good behavior, and for keeping the peace, and to be imprisoned till such security were found. I believe there could be no doubt if at the time of the argument we could have referred to the case of *Rex* v. *Hurt*, 30 How. St. Tr. 1131, 1194, 1344. We now find on referring to the notice of that case in the journals of the House of Lords, that the learned judges delivered their unanimous opinion in answer to a question from the House, that in all cases of misdemeanor the court might give sentence in that form. Therefore the judgment of the Queen's Bench must be affirmed."

That case was a case of a common law misdemeanor, and so also was the only other case referred to that of *Rex* v. *Hurt*. The offence in that case was the publishing in a newspaper of

libels. (See note at the end of *Dunn* v. *The Queen*, 12 Ad. & Ell. 16 Eng. C. L. R. p. 1031.) In both these cases the punishment inflicted was not fine only but imprisonment. So that despite the broad language used by the English judges the decisions in England have only gone to the extent, that, when a court renders judgment for a common law misdemeanor and inflicts on the defendant a punishment, it may in its discretion add to the judgment an order requiring the defendant to enter into a recognizance with good securities to keep the peace and be of good behavior.

In New York by statute-law every court, before which any person is convicted of a misdemeanor, has power in addition to the judgment or sentence authorized to be pronounced against him to require of the defendant to give security to keep the peace, &c., for any time not over two years, or stand committed till such security is given; but this power does not extend to convictions for libels. (2 R. S. 737, sec. 1.) With the exception of New York there is, so far as I know, no State in the Union, where the practice prevails of adding to judgments by courts for misdemeanors an order requiring the defendant to give security to keep the peace or to be of good behavior.

The Attorney General, who, as his brief shows, has made a most careful examination of all the points arising in this case, referring to many authorities refers to no authority in the United States recognizing such practice except 2 Humph. 496; and in reference to this he says : "At common law courts of record had power to require securities for good behavior or of those found guilty of *gross* misdemeanors. 2 Humph. 496." I have no access here to the Tennessee Reports, and can not say, whether this is the mere *dictum* of a judge or the decision of a Tennessee court. But I presume, that no one guilty of a statutory misdemeanor could in Tennessee under this dictum or decision upon conviction in addition to his sentence be required to give security for his good behavior or to keep the peace or a mere statutory misdemeanor could hardly be regarded as a *gross* misdemeanor. That could hardly be regarded as a *gross* misdemeanor, which the common law did not regard as deserving of any punishment. It seems to me, to be a highly objectionable practice for a court

on the conviction of a defendant for any misdemeanor whatever, whether a slight or a gross misdemeanor, to add to the judgment against him an order requiring him to give securities to keep the peace or to be of good behavior. The evidence necessary to justify the requirement of any person to give security, either to keep the peace or to be of good behavior, is so entirely different from that required to convict any one of a misdemeanor, that it would be impossible for a court from the evidence, which was given before a jury, who had found a defendant guilty of a misdemeanor, to decide whether it was right or not to require him to keep the peace and be of good behavior. In the trial for the misdemeanor no evidence is permitted to be introduced by the commonwealth except that, which tends to prove, that the defendant has committed the past misdemeanor, of which he stands charged. Now by the common law no man can be required to give sureties to keep the peace or be of good behavior, simply because he has committed a past misdemeanor. But such sureties to keep the peace could only be required of a person to protect some individual against injury, which he has just cause to fear such person intends to commit against him. Thus Hawkins states the cause, for which such surety to keep the peace may be required as follows:

"Whenever a person has just cause to fear that another will burn his house or do him corporal hurt as by killing or beating him, or he will procure others to do him such mischief, he may demand the surety of the peace against such person, and that every justice of the peace is bound to grant it, upon the parties giving him satisfaction upon oath, that he is actually under such fear, and that he has just cause to be so, by reason of the others having threatened to beat him, or laid in wait for that purpose; and that he doth not require it out of malice or for vexation." Haw. b. 1 ch. 60 sec. 6. "And it seems the better opinion that he who is threatened to be imprisoned by another, has a right to demand the surety of the peace; for every unlawful imprisonment is an assault and wrong to the person of a man. And the objection that one wrongfully imprisoned may recover damages in an action, and therefore needs not the surety of the peace, is as strong in the case of battery as imprisonment; and yet

there is no doubt, but that one threatened to be beaten may demand the surety of the peace." Haw. b. 1 ch. 60, sec. 7.

But surety of the peace is grantable only on an apprehension of present or future danger and not for a battery, &c. that is past; in this last case the offender may be indicted. Dalton, ch. 116:

Now it seems to me obvious, that if these are the grounds, on which one can be held to surety for the peace, and this be reason, for which it should be granted, the evidence, which may be given before a jury, on which a defendant is found guilty of any misdemeanor, can never furnish to the court grounds, upon which the defendant when convicted could be legally required to give sureties to keep the peace. For any evidence to prove, that any person had just grounds to fear, that the defendant would burn his house or do him corporal hurt or imprison him or indeed do him any injury of any sort would of course never be given in the trial of any defendant for any misdemeanor; for all such evidence would be clearly inadmissible. As for instance there is not one particle of evidence of this character in the case before us; and without evidence of this character no one can legally be required to give security of the peace. It seems therefore necessarily to follow that no court can have the power to require a defendant, who has been convicted of any misdemeanor, to give security of the peace because of such conviction by adding an order, that he shall give such security, to its judgment against him on the verdict of the jury. And upon like grounds it seems to me clear, that a court ought not to have the power to demand securities for his good behavior of any one, merely because he has been convicted of any misdemeanor. The grounds upon which any person may be required to give surety for his good behavior have always been fixed by statute-law. The ancient law on that subject is thus stated by Hawkins:

"Under the Act of 33 Edw. III, ch. 1, it hath been holden that a man may be bound to his good behaviour for causes of scandal *against good morals* as well as *against the peace;* or for haunting bawdy houses with women of ill-fame, or keeping such women in his house. Then also night-walkers; eavesdroppers; such as keep suspicious company, or reported to be

pilferous or robbers; such as sleep in the day and walk at night, common drunkards; whore-masters; the putative fathers of bastards; cheats; idle vagabonds; and other persons whose misbehaviour may reasonably bring them within the general words of the statute as persons not of good fame." Haw. b. 1 c. 61 § 2; 4 Bluch. Com. 256.

By the 1 Rev. Code of 1819 ch. 74, persons could be required to give sureties for their good behavior *who are not of good fame*, thus leaving the law substantially as it was under 34 Edw. III, ch. 1. And to these particular cases were specified in the Rev. Code of 1819, in which sureties for good behavior might be required. And to this day the general statutory provision has remained, that persons not of good fame could be held to give surety for their good behavior, the law being unchanged by the statutes changing from time to time certain special cases specified as cases, in which a person could be required to give sureties for their good behavior. The ground, on which persons could generally be held to give surety for their good behavior, has thus always been that they were persons of bad character leading low and degraded lives. None others could ever have been legally required to give such security for their good behavior except in some special cases specified in some statute in force at the time.

Of course no evidence in the prosecution of any one for a misdemeanor could be introduced to prove that the accused was a man of bad character, or that he led a low and degraded life. Such evidence would be inadmissible in a trial of any person for a misdemeanor. It would seem therefore to follow, as it would be impossible for the court from the evidence introduced on the trial of a misdemeanor to know what was the general character of the accused, or what his general habits of life, that the court, before whom such trial for any misdemeanor however gross was had, ought not to be allowed to add to the punishment of the prisoner, if convicted by the jury, an order that he should give security for his good behavior and be imprisoned till he did so. For such a trial affords the court no opportunity of fairly judging whether such security for his good behavior can legally be required of the prisoner. Take for instance the case before us There is not a particle of evidence, which shows that the defendant

is a man of bad character. For anything, which the evidence shows to the contrary, he may be a man of excellent character, and his mode of life may be highly respectable. It may be said that in practice sureties for good behavior, are often required of persons of good character. This is probably true, as there is no branch of the law, which has been as much abused as this; and very many persons have been illegally required to give security for their good behavior. But this is but an additional reason, that we should do what we can to stop the abuse of law, which, if administered in proper spirit, is a great protection to the community; but which because of its indefiniteness is in its administration often grossly abused. Our existing statute-law gives no countenance to this rendering a law intended for the protection of a community a means of gross oppression. Our Code ch. 153 p. 702 authorizes no one but persons not of good fame to be required to give securities for their good behavior except in a very few cases set out specifically in the statute-law. (Code ch. 153, §§ 1, 9, 11.)

So far as I know or ever heard till now, it never has been a practice in this State or in Virginia for the circuit court to require surety of the peace or of good behavior of defendants convicted of misdemeanors however gross. And it seems to me that to permit the courts to add to the sentence of a defendant convicted of any misdemeanor an order requiring such sureties would violate the provisions of ch. 153 of the Code. If such bonds are under such circumstances ever allowed to be required by the circuit courts, they must be required, simply because the defendant has committed a gross misdemeanor, and this is never a ground for demanding such bonds and securities.

The circuit court therefore had not the right to add to its judgment this requirement, that the defendant should give such bonds with security to keep the peace and be of good behavior, and that he should be confined in jail, till such bond was given. It had no power except to enter up judgment for the $50.00 fine, which the jury had assessed, and it might if it had thought proper, have added to the punishment of the defendant imprisonment not exceeding ten days. But the court was of opinion, that the fine of $50.00 was sufficient punishment for the offence, which had been committed,

and did not add any imprisonment thereto. Of course this addition of requiring him to give bond and security to keep the peace and be of good behavior could not have been intended as any part of the punishment for the misdemeanor, which he had committed, but was merely to prevent the commission of future offences. This he had no right to do as an addition to the judgment he rendered in this case.

This judgment must therefore be set aside and reversed; and this Court must enter up such judgment on this verdict as the court below should have entered up, that is, that the State of West Virginia recover against the defendant below the sum of $50.00 the fine by the jury assessed in their verdict and its costs by it in the prosecution of this case in the circuit court of Wood county expended. If the circuit court had not by the judgment it has entered shown, that it did not deem that any imprisonment should be added as a further punishment of the defendant, we should have deemed it necessary to remand the case to the circuit court to enter up the proper judgment, as the court below has the discretion to add this imprisonment, if it deems proper, and not this Court. But as the court below has in effect said, that no such imprisonment should be added, we deem it unnecessary to remand the case, and enter up the proper judgment here.

REVERSED IN PART.    AFFIRMED IN PART.