STATE *ex rel.* JAMES BURKHAMER

*v.*

DONIVON E. ADAMS, *Warden*

(No. 10961)

Submitted April 22, 1958. Decided May 27, 1958.

*John S. Stump, Jr., Lloyd H. Young,* for relator.

*W. W. Barron,* Attorney General, *W. Bernard Smith,* Assistant Attorney General for respondent.

GIVEN, JUDGE:

On the original petition, filed by the State at the relation of James Lee Burkhamer, apparently prepared by Burkhamer without aid of counsel, praying for a writ of habeas corpus ad subjiciendum against the warden of the state penitentiary, this Court awarded the writ and appointed counsel to represent Burkhamer in the proceeding. The appointed counsel filed an amended and supplemental petition, setting forth more clearly and in more detail the charges alluded to in the original petition, and alleged other grounds or bases for the release of Burkhamer, who will be referred to herein by name. Defendant, warden of the state penitentiary, in the answer and return filed herein, relies on certain judgment orders entered by the Criminal Court of Harrison County in a criminal proceeding against Burkhamer as justification of the imprisonment. What appears to be the entire record of the criminal proceeding is included in exhibits and filed with the pleadings in the instant proceeding. Testimony adduced in the instant proceeding is filed. Matters at issue were fully briefed and argued orally by counsel for Burkhamer and for the State.

It is the contention of Burkhamer, based on allegations in the pleadings, that the judgments by virtue of which he is imprisoned are void for the reason that the Criminal Court of Harrison County had no jurisdiction to enter the judgments, having lost jurisdiction in the denial of due process, in that Burkhamer was not properly arraigned, that he was not effectively represented by counsel, and that he, at the time of the arraignment, did not have sufficient mental capacity to intelligently understand the nature or effect of his plea, which was "guilty of murder of the first degree". No question is raised, and we think no question could have been justifiably raised, as to the sufficiency of the indictment to which the plea was made, of the jurisdiction of the Criminal Court of Harrison County of crimes of murder of the first degree, or as to the jurisdiction of that court over the person of Burkhamer.

From a full and careful study and consideration of the pleadings, exhibits, evidence and arguments, we are of the view that Burkhamer, as defendant in the criminal proceeding, was properly and effectively represented by three capable and experienced members of the Bar, two of whom were employed by the mother of Burkhamer with his full acquiescence, the third attorney having actively participated in the preparation and trial at the instance of the employed attorneys, but with the full knowledge and acquiescence of Burkhamer; that Burkhamer, at the time of entering the plea, possessed sufficient mental capacity to understand, and did understand, the full import, nature and effect thereof; and that he was not denied, or deprived, of any constitutional or substantial right in the arraignment on the indictment to which he entered his plea.

Burkhamer, at the time of his trial, was about twenty four years of age. On the evening of May 5, 1957, after dark, Charlene Vilain, a girl about eleven years of age, was sent by her mother to a nearby store to purchase some tea bags and ice cream. After making the purchases, on her return trip toward home she was attacked by Burkhamer, carried from the sidewalk through an alley, through a hedge, into the rear of a residence property. When found, a few minutes after the attack, the girl was dead from strangulation, and evidence established that an attempt of rape, at least, had been made upon her. Confessions of defendant admit the attack was made by him. Other evidence seems to establish, without doubt, the responsibility of Burkhamer for the attack and death. Such facts, and the nature, at least, of the evidence of the State to support them, were well known to Burkhamer, his mother, other relatives, and the attorneys representing him, before the tender of his plea.

The crime was committed on May 5, 1957. The indictment was returned by a grand jury, at a regular term of court, on June 5, 1957. Burkhamer was first brought to the bar of the court on June 14, 1957, at which time

his counsel moved the court to "inquire into the mental condition of the defendant", which motion the court took time to consider. On the seventeenth day of the same month the motion was sustained, and the court then appointed Lynwood D. Zinn and James A. Thompson, medical doctors, to make an examination and report as to the mental condition of Burkhamer. This was done. On July 2, 1957, counsel for Burkhamer moved the court for a general continuance, which was denied. But the court did sustain a later motion for a continuance to July 23, 1957. On July 23, 1957, Burkhamer, the three attorneys representing him being present, tendered to the court his plea of guilty of murder of the first degree. Code, 62-3-15, provides: " * * * If the accused plead guilty of murder of the first degree, sentence of death or confinement in the penitentiary for life shall be pronounced upon him by the court, as may seem right, in the same manner and with like effect as if he had been found guilty by the verdict of a jury * * *".

The order of July 23, 1957, shows that before the court accepted the plea tendered, Burkhamer was questioned at length by the court. The full procedure had in open court, between the time of tender of the plea and acceptance thereof by the court, is not set out in any order, but the order showing the tender and acceptance recites that "the Court interrogated the defendant at length, which examination is recorded in the Court Reporter's notes, and then the Court suggested to defense counsel to again confer with the defendant in the attorney's conference room", which conference was held. After returning from that conference, the court asked counsel for Burkhamer, "Do you believe he understands what he has done?"; and counsel stated: "I am sure he does, Your Honor". After further questioning of Burkhamer by the court, the order shows that he "again stated to the Court that he wished his plea to stand, which said plea was then accepted by the Court, the defendant, in the opinion of the Court, having been cautioned properly and the penalties and nature of the offenses explained to him". Sentence of death by

electrocution, as provided by law, was not imposed until December 14, 1957.

On the same day of the entry of the order showing acceptance of the plea, July 23, 1957, a separate order was entered which recited the appearance of the two physicians appointed by the court to make examinations and reports of Burkhamer's mental condition, and the presentation of statements for the services rendered, the allowance of charges, and the direction that "the Auditor of this State" make payment thereof "out of the State Treasury, as provided by statute". No other matter is mentioned in the order. Its only significance here is that Burkhamer contends it constituted a part of the criminal trial, and that the order should have recited the presence of Burkhamer at the time of the consideration of the matters mentioned therein. See Code, 62-3-2.

As noted in the order of July 23, 1957, recording the acceptance of the plea, the full proceedings had in open court with reference to the arraignment of Burkhamer, stenographic notes were made of the proceedings and a transcript thereof, and a transcript of the evidence taken before the court for the announced purpose of assisting the court in determining the proper sentence to be imposed, are filed herein as an exhibit with the answer and return of defendant. The extensive questioning by the court, and of counsel, is too voluminous to record in this opinion, and we think that a statement of the nature thereof will be as helpful.

After the convening of court on July 23, 1957, counsel for Burkhamer requested a recess "in which to discuss this matter with the defendant and his mother". The motion was granted and, after the recess, the State called the case against Burkhamer, and his counsel then announced that Burkhamer was ready to enter a plea. The court then required Burkhamer to come forward and sit at the bar of the court. After preliminary questions identifying Burkhamer as the person named in the indictment, the court advised Burkhamer that "A grand jury of this county

has returned an indictment against you which alleges you, James Lee Burkhammer, in this county, feloniously, wilfully, maliciously, deliberately and unlawfully did slay, kill and murder, on the _____ day of May, 1957, one Charlene Vilain". After so advising Burkhamer, the court asked him: "What is your plea, guilty or not guilty?" The answer by Burkhamer personally was "Guilty, Your Honor". Then immediately the following questions were asked by the court and the following answers given by Burkhamer: " THE COURT: You enter a plea of guilty? A. Yes, Your Honor. THE COURT: What do you plead guilty to? A. Murder, Your Honor. THE COURT: Murder in this state has two degrees, first degree and second degree. What degree? A. First degree, Your Honor. THE COURT: You plead guilty of first degree murder? A. Yes, Your Honor. THE COURT: You do this after consultation with your attorneys? A. Yes, Your Honor. THE COURT: Do you know the penalties involved? A. Yes, Your Honor. THE COURT: What are the penalties of first degree murder? A. Death and life imprisonment. THE COURT: You know the court can pronounce a judgment of death on this plea? A. Yes. THE COURT: You enter this plea voluntarily? A. Yes, Your Honor. THE COURT: How old are you? A. Twenty-four. THE COURT: How far did you go in school? A. Twelfth Grade. THE COURT: You finished the Twelfth Grade? A. Yes, Your Honor. THE COURT: Where? A. Victory High School. THE COURT: Has any one promised you anything to get you to enter a plea of guilty? A. No, Your Honor. THE COURT: Has any one suggested they might get you committed to a mental institution or in all likelihood you would be, or held out any kind of hope of reward—was anything like that held out to you? A. No, Your Honor. THE COURT: You know this indictment charges four different offenses and if tried by a jury the jury could return a verdict of first degree murder. Without more on it the court would be compelled to enter a judgment of death. The jury could return a first degree murder verdict with a further finding which means you would be confined in the penitentiary

for life or life imprisonment. Upon trial the jury could return under this indictment a verdict of guilty of second degree murder carrying a penalty of from five to eighteen years. Upon trial a jury could return a verdict of voluntary manslaughter carrying a penalty of one to five years. Upon a trial by a jury the jury could return a verdict under this indictment, if the evidence so warranted, of involuntary manslaughter which carries a jail sentence and a fine, either or both. This has all been explained to you? A. Yes, sir. THE COURT: Who, if anybody, advised you to plead guilty? A. I was not advised, Your Honor. THE COURT: You were not advised to plead guilty? A. Not advised but explained to me. THE COURT: Who explained it to you? A. Mr. Billingslea. THE COURT: He explained all these verdicts that could be returned by a jury? A. Yes, sir. THE COURT: But you say he didn't advise you to plead guilty? A. (No answer). THE COURT: Do you want to answer that question? A. Yes, Your Honor. He explained it to me and I thought it the best way to do it. THE COURT: He explained it to you and you thought that was the best way to do it? A. Yes, Your Honor. THE COURT: Has any one threatened you in order to get you to plead guilty? A. No, Your Honor. THE COURT: Has any one brought any sort of pressure to bear on you? A. No, Your Honor. THE COURT: Have you talked this over with your mother? A. Yes, Your Honor. THE COURT: What did she say? A. She agrees with me. THE COURT: To your entering a plea of guilty of murder in the first degree? A. Yes, Your Honor." After suggestions to the court by counsel for the State and counsel for Burkhamer, there was much further questioning of Burkhamer by the court. Upon being asked his reasons for entering the plea, Burkhamer replied: "A. Your Honor, I co-operated with the police from the beginning and voluntarily told the truth and I see no reason to start lying now. THE COURT: Do you care to say anything further on that score? A. I believe the truth is always the best way and the only way. THE COURT: Do you care to make any further statement along that line? A. No, sir."

The transcript of the proceedings in the criminal court shows that the court very clearly and fully advised Burkhamer of his right to plead guilty or not guilty, and of his rights as to trial by jury. A reading of the transcript of the proceedings will leave not the least doubt that the answers of Burkhamer, if made with sufficient understanding and intelligence, establish that he fully understood, and was fully advised, as to his rights with reference to the making of a plea, with reference to a jury trial, and as to the consequences of a plea of guilty of murder of the first degree, and that the plea tendered was tendered voluntarily, without any threat, promise or improper inducement. There is, perhaps, no doubt that Burkhamer personally believed that he was less likely to be sentenced to death by entering the plea of guilty than by a sentence upon a jury verdict, but it seems just as clear, assuming that his answers were understandingly made, that he voluntarily elected to tender the plea. See *State v. Hill*, 81 W. Va. 676, 95 S. E. 21, 6 A. L. R. 687.

The testimony relating to the mental condition of Burkhamer, his ability to understand intelligently the nature of the charge contained in the indictment, or the advice given to him by the court or by counsel, or as to his understanding of his rights with reference to the plea, trial or sentence, we attempt to state briefly. The two medical doctors appointed by the court, named above, made separate and individual examinations and conclusions, but a joint written report was filed with the court. In the report, as well as in the testimony taken before the court, they stated that Burkhamer "is not mentally defective" and was not "mentally ill" and that Burkhamer was not mentally defective or mentally ill on the fifth day of May, 1957, the date of the commission of the offense; and that Burkhamer "knew the difference between right and wrong"; but say that he is possessed "of personal or emotional unbalance, but there is a distinction between mental disease and psychosis". When asked as to the "average" in mentality of Burkhamer, Dr. Thompson replied: "Well,

I did not perform an I. Q. test, but from my interview I would say about the average, low average".

Dr. Grosvenor B. Pearson, a graduate of a medical school, with extensive training and experience as a psychiatrist, in the practice of that profession since 1933, was called as a witness for Burkhamer. After full examination and investigation, Dr. Pearson was of the opinion: "I think I can probably do that best from quoting from my own letter: 'I believe he has been a defective, pathological personality, with grave doubts about his masculine role, strong sexual conflicts and fears; and that a combination of strain and fear combined with opportunity resulted in a period of disorganized but not psychotic behavior. I do not believe that on the occasion in question he acted with malice-in-heart, but unconscious motivations dominated with the situation and overwhelmed his judgment. I think great anxiety and frustration existed, so that an explosive reaction took place; but this was not a psychotic period, nor a normal period for him. This man is psychologically sick to such a degree that medical (psychiatric) treatment is needed' ". On cross-examination, he was asked and answered the following question: "Q. I notice from the first page of your report, you say this, and I quote: 'From my examination and the psychologist's report, it is my considered opinion that Mr. Burkhammer is not insane; nor do I think he has been insane.' Is that still your opinion? A. I do not think he was insane on this occasion, nor do I think he is now."

A Dr. Berger also examined Burkhamer, apparently at the request of Dr. Pearson, but did not testify. Apparently, some tests made by Dr. Berger were considered by Dr. Pearson in reaching the conclusions given by him, and Dr. Pearson was permitted to testify to the effect that the conclusions of Dr. Berger were substantially the same as those of his own.

A number of lay witnesses testified, both at the instance of the State and at the instance of counsel for Burkhamer. No instance or any action of Burkhamer is indicated by

such evidence which would lead to any reasonable conclusion that Burkhamer was insane, or that he did not know right from wrong, either at the time of the commission of the crime or at the time of the tender or entry of the plea. The most that can be said from such evidence is that Burkhamer was emotionally unstable, appeared to be below average in mental capacity, was "backward", "bashful", and did not at times act like others of his age. It is also shown that he received a medical discharge from the navy and a like discharge from the marine corps, because he was not "mature enough". The matters contained in the discharges, however, were considered by the doctors who testified. On the other hand, some of the lay witnesses testified to the effect that Burkhamer acted as any normal person of his age. It is not questioned that he graduated from high school at the age of eighteen or nineteen years.

We have not detailed the testimony relating to effective representation of Burkhamer by counsel at the time of the entry of the plea. That can, perhaps, be done more pointedly and briefly with the discussion of the questions relating thereto.

Preliminarily, we are met with a contention of Burkhamer to the effect that we can not consider the matters relating to the arraignment, or any other matters disclosed by the reporter's transcript of the criminal proceeding, or the testimony, for the reason that such transcript was not properly made a part of the record of such proceeding. The transcript contains a proper certificate of the official court reporter, but no certificate or signature of the trial judge is annexed thereto. Neither is there any regular bill of exceptions, though, as noted above, the transcript was filed, or at least attempted to be filed, by an order of the court as part of the record of the criminal proceeding. We think the contention not substantial. An answer to the question as to whether the transcript constituted a part of the record of the criminal proceeding does not determine the question whether it is part of the record of

the instant proceeding. A stipulation herein shows that the transcript is the document mentioned in the order of the court, and that document is exhibited with the answer and return, as permitted by a rule of this Court promulgated December 10, 1955, 141 W. Va. x, which reads as follows: "In any original proceeding in habeas corpus, mandamus, or prohibition instituted in this Court exhibits may be filed with and made a part of the pleadings in such proceeding."

Is the sentence imposed on Burkhamer void, did the Criminal Court of Harrison County lose jurisdiction, was due process denied, for the reason that (1) Burkhamer was not properly arraigned, or for the reason that (2) he was denied the right to be heard, or for the reason (3) the court made no actual finding or recording as to the mental capacity of Burkhamer before accepting his plea, or for the reason that (4) the order of the court of July 23, 1957, allowing and directing the payment of the charges of the appointed physicians, did not show the personal presence of Burkhamer, or for the reason that (5) Burkhamer was not properly represented by competent counsel?

The principal contention as to lack of proper arraignment relates to the manner in which the court advised Burkhamer as to the charge contained in the indictment. It is contended that the court should have read the entire indictment to Burkhamer before permitting him to plead. As noted above, however, the court did, at the proper time, advise Burkhamer in almost the exact language of the indictment, of the return thereof by the grand jury, and of the charge against him as contained therein, and of each essential element of such charge. The arraignment, of course, is an essential element of the trial of a defendant charged with a felony, but, in this State, a "formal" arraignment as under the very early common law, is no longer required. Code, 62-3-2. It is essentially necessary, to constitute a proper and sufficient arraignment, that a defendant be fully advised as to the nature of the charge, of his rights of trial and the con-

sequences of his plea, where a plea of guilty is tendered, and that the defendant understand the nature of the charge and the consequences of the plea. It is, of course, required that the plea be offered and accepted in open court, and that it be made by the defendant in person. Code, 62-3-2. *State* v. *Allen,* 45 W. Va. 65, 30 S. E. 209. It is not believed necessary, however, that all facts and circumstances having any relation to the ability of the defendant to intelligently make the plea or understand the consequences, must be made a matter of record. To require that would make an arraignment practically impossible. Necessarily, a proper determination of the questions relating to what constitutes an arraignment often depends on such facts or circumstances as the intelligence, learning, experience, age and habits of the defendant, and whether or not he is represented by competent counsel. Such questions must necessarily be decided in the first instance by the trial court, and its determination thereof is accorded much weight. We are not, of course, intimating that no record of the arraignment need be made. An arraignment of a defendant in a criminal proceeding is an essential element of a fair trial, and its importance to the State, as well as to a defendant, makes it essential that the fact thereof be not left to memory, doubt or speculation. We simply say that, in the instant proceeding, it is clearly established by the record that, in the arraignment, Burkhamer was called to the bar of the court, definitely identified as the person named in the indictment, advised fully of the charges made against him by the grand jury, of his rights as to making a plea, of his right to a jury trial, of the different possible verdicts, and of the possible consequences of the plea, all in open court. We think nothing further was essential. See *State* v. *Beatty,* 51 W. Va. 232, 233, 41 S. E. 434; *Crain* v. *United States,* 162 U. S. 625, 16 S. Ct. 952, 40 L. ed. 1097.

Contention of counsel for Burkhamer to the effect that he was denied the right to be personally heard, before being sentenced, rests on the fact that the order of the court sentencing Burkhamer does not recite that before

imposition of sentence, Burkhamer was asked if he had anything further to say. We need not consider whether such a question must be directed to a defendant in every such case, though, as we understand, that is the usual practice, for the reason that an order of the court made on the day Burkhamer was sentenced, made part of the record of the instant proceeding, sometimes referred to as a commitment order, shows that "the Court having asked the defendant whether he has anything to say why judgment should not be pronounced, and no sufficient cause to the contrary being shown or appearing to the court, it is adjudged that defendant is guilty as charged and convicted". It being clearly established that Burkhamer was denied no right, the mere failure to recite a fact in the order sentencing him would constitute, at most, an error in the trial, not reachable in habeas corpus. See *Dye* v. *Skeen, Warden,* 135 W. Va. 90, 62 S. E. 2d 681; *State ex rel. Nutter* v. *Mace,* 130 W. Va. 676, 44 S. E. 2d 851.

Burkhamer's complaint as to the lack of any record of any specific finding by the criminal court as to his mental capacity does not present any question as to whether that matter was fully considered by the court before the acceptance of the plea. That such matter was fully considered can not be doubted. In view of the nature and comprehensive examination of Burkhamer by the court, the appointment of two physicians to make mental examinations, and the considerable testimony adduced in the presence of the court, relating to that question, it is clear and certain that the matter was given consideration before the imposition of sentence. Assuming, not suggesting, that the recording of the actions of the court in accepting the plea and in sentencing Burkhamer was not such a recording or adjudication of mental capacity as might be desirable, the fact remains that the record in the instant proceeding shows that Burkhamer was denied no substantial right. See *State* v. *Stone,* 127 W. Va. 429, 431, 33 S. E. 2d 144. If the failure to record such a finding constitutes error, it is one not reachable in a habeas corpus proceeding. See *Dye* v. *Skeen, Warden, supra; State ex rel. Nutter* v. *Mace,*

*supra; Kaizo* v. *Henry,* 211 U. S. 146, 29 S. Ct. 41, 53 L. ed. 125.

Was Burkhamer denied any constitutional or substantial right by the failure to recite, in the order relating to the payment of charges of the court appointed physicians, that Burkhamer was not personally present when the matter of the fees was considered by the court? We think not. See Code, 62-3-2. The statute is not construed so as to require the presence of a defendant in court at the time of consideration of a matter which is no part of a criminal trial, or can not affect any right of his. Therefore, not even prejudicial error exists. See *State v. Blankenship,* 137 W. Va. 1, 69 S. E. 2d 398; *State* v. *Roberts,* 122 W. Va. 536, 11 S. E. 2d 172; *State* v. *Lucas,* 103 W. Va. 743, 138 S. E. 393.

The chief complaint made in the original petition was that the three attorneys representing Burkhamer in the criminal proceeding did not do so properly or effectively, and that Burkhamer had "been without the assistance of counsel since the time of his arrest to the present moment * * *". The original petition also contained allegations to the effect that Burkhamer was induced to tender the plea of guilty by reason of false representations and promises to the effect that the trial judge would not impose the death sentence, but would pronounce a life sentence, and that hospital services would be made available to Burkhamer. In the instant proceeding, all such allegations are clearly and completely refuted. The record is clear, is undisputed, that soon after the arrest of Burkhamer in connection with the crime charged against him, his mother, with his full knowledge and approval, employed two active and capable members of the bar to represent Burkhamer, and that arrangement was made by such two attorneys with a third attorney who was active in his practice and who had much experience in criminal trials. Such arrangement was known to and, at least, acquiesced in by the mother and Burkhamer. The third attorney was active in the defense, and it is not questioned that one or more of the attorneys were present in court at each

step of the criminal proceeding. The three were present at the time of the tender and acceptance of the plea, and at the time of the imposition of sentence. Each gave testimony in the instant proceeding, and say, in effect, that their investigation of the State's case against Burkhamer was full and thorough; that they, on numerous occasions, consulted with Burkhamer and relatives concerning matters involved; that they fully advised him of the nature of the charge, his rights as to jury trial and as to the entry of any guilty or not guilty plea; and as to the possible consequences of any conviction or any plea. They deny that they ever advised him to enter any guilty plea but say, on the contrary, that Burkhamer, from the beginning, voluntarily elected and insisted on the tender of the plea as accepted by the trial court. They specifically deny the making of any representations or suggestions as to what the sentence of the court would be in the event of the acceptance of any plea. Little, if any, evidence exists to put in doubt such testimony of the attorneys. The record in the criminal proceeding appears to us to fully support their testimony.

It is argued that the absence of any motion for a change of venue, because of the existence of extreme ill feeling and prejudice toward Burkhamer in Harrison County, indicates lack of professional duty and diligence. But why a motion for a change of venue if a plea of guilty was to be tendered? It is also argued that because the record made in the criminal trial indicates no objections or exceptions were taken to actions of the court, or as to evidence offered by the State, and because no writ of error to the order pronouncing the death sentence was applied for, a showing of lack of proper representation was made. We do not agree. Such matters do not even indicate a neglect of duty, in the circumstances of this case. The evidence offered was not for the purpose of obtaining a finding of guilty, but to aid the court in determining a proper sentence, and in mitigation of punishment. See Code, 62-3-9. True, other attorneys may have, or may not have, pursued the same course of procedure followed by counsel.

That, however, is no test. Even at this late day it can not be said with any degree of confidence that the manner of representation by counsel was not proper. A defendant in a criminal case is not constitutionally guaranteed such assistance of counsel as will necessarily result in his acquittal. Counsel, of course, must diligently attempt to see that no constitutional or substantial right is denied such a defendant and that he is afforded a fair and impartial trial. It is just as clear, however, that counsel should be fair and honorable in their actions and in their representations to the court. See *Ex Parte: Farmer,* 123 W. Va. 304, 14 S. E. 2d 910.

The only remaining question of such importance as to merit consideration here relates to the mental capacity of Burkhamer to understand and appreciate the nature and effect of the plea tendered by him, or the consequences of his acts which resulted in the death of Charlene Vilain. We are not unaware of the considerable authority to the effect that where an individual is afforded the right to have any question of his sanity tried in a criminal proceeding, as in this State, such question can not be retried in a habeas corpus proceeding. Without deciding the precise question, however, we have first looked to the sufficiency of the evidence adduced, both in the criminal proceeding as set out in exhibits herein, and the testimony adduced in the instant proceeding. That evidence has been carefully detailed above, and our conclusion is that it is entirely insufficient to establish lack of any mental quality, character, or ability on the part of Burkhamer to intelligently understand and appreciate the consequence of his acts with reference to the time of the commission of the crime and, as well, at the time of the tender and acceptance of the plea of guilty, and that Burkhamer did fully and intelligently so understand, though perhaps he was possessed of intelligence, mental capacity and abilities somewhat below those of an average person of his age. Three physicians, one a psychiatrist, testify to the effect that he knew right from wrong, and no expert witness testified to the contrary. The other evidence, detailed

574

above, we believe fully supports them. In *State* v. *Harrison*, 36 W. Va. 729, 15 S. E. 982, 18 L. R. A. 224, we held: "10. A person partially insane is yet responsible for a criminal act if at the time of the act he knows right from wrong, and knows the nature and character of the particular act and its consequences, and knows that it is wrong, and is hurtful to another, and deserves punishment. In such case no mere irresistible impulse to do the act will exempt him from criminal responsibility for such act." See *State* v. *McCauley*, 130 W. Va. 401, 43 S. E. 2d 454; *State* v. *Barker*, 92 W. Va. 583, 115 S. E. 421; *State* v. *Cook*, 69 W. Va. 717, 72 S. E. 1025; *Hiett* v. *Shull*, 36 W. Va. 563, 15 S. E. 146; *U. S. ex rel. Smith* v. *Baldi*, 344 U. S. 561, 73 S. Ct. 391, 97 L. ed. 549; *Leland* v. *Oregon*, 343 U. S. 790, 72 S. Ct. 1002, 96 L. ed. 1302.

From the conclusions stated herein, it necessarily follows that the writ of habeas corpus ad subjiciendum heretofore awarded James Lee Burkhamer must be discharged, and that custody of Burkhamer must be remanded to the Warden of the Penitentiary of the State of West Virginia, to be further dealt with as provided by law.

> *Writ discharged;*
> *relator remanded to custody*
> *of Warden.*